UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* HAROLD SALOMON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DERISH M. WOLFF *et ano.*,<br><br>　　　　Defendants. | Civil Action No.: 17-5456 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way by the United States of America's Motion to Strike Affirmative Defenses pursuant to Rule 12(f) of the Federal Rules of Civil Procedure (ECF No. 156) and Motion for Partial Judgement on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 162). The United States ("Government") partially intervened in Plaintiff Harold Salomon's *qui tam* civil action on April 27, 2016. (ECF Nos. 2, 79). Defendants have opposed the Government's motions (ECF Nos. 169, 170), to which the Government has replied. (ECF Nos. 177, 178). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies both motions.

## I.　　BACKGROUND[1]

Pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA"), Plaintiff/Relator Harold Salomon ("Relator"), brought this *qui tam* civil action seeking to recover monetary

---

[1] This background is derived from the Government's Intervenor Complaint, which the Court must accept as true at this stage of the proceedings. See *Alston v. Countywide Fin. Corp.*, 585 F.3d 53, 758 (3d Cir. 2009).

damages and civil penalties from Defendants for, *inter alia*, knowingly submitting or causing to be submitted false claims to agencies of the Government. (ECF No. 83, ("IC") ¶ 13). Relator worked for the Louis Berger Group Inc. ("LBG") from March 2002 to October 2005. (IC ¶ 15). While working for LBG, Relator prepared overhead rate statements submitted by LBG to the Government. (IC ¶ 16). The Government partially intervened in Relator's *qui tam* action under the FCA on April 27, 2016. (IC ¶ 20). Defendant Wolff contends that Government investigators and auditors received information from Relator months prior to his filing of the *qui tam* complaint. (ECF No. 169 at 2).

Defendant Derish M. Wolff is presently a resident of Miami, Florida. (IC ¶ 21). He was the president and chief executive officer of LBG from 1982 to 2002, and chairman of the board of BG Holdings from 2002 to 2010. (Id.). Defendant Salvatore J. Pepe is presently a resident of Tuckahoe, New York and was the controller of LBG from 2000 to 2006, and chief financial officer of LBG from 2006 to 2009. (IC ¶ 24). Non-party Precy Pellettieri, an alleged co-conspirator, was the general accounting manager and assistant controller of LBG from September 2000 to May 2006, and controller of LBG from June 2006 to June 2009. (IC ¶ 27). The Government alleges that Defendant Wolff admitted, in his guilty plea, between 2003 and 2006 he was involved in the "journal entry" scheme discussed below, and that Defendant Pepe admitted, also in his guilty plea, to his involvement in the scheme between September 2001 to August 2007. (IC ¶ 86).

"LBG is a New Jersey corporation with its corporate headquarters in East Orange, New Jersey." (IC ¶ 29). LBG has "over 3,000 employees and operates more than 140 offices across the United States and throughout the world." (IC ¶ 30). LBG is in the business of construction, engineering, and environmental work performed outside of the United States. (IC ¶ 31).

"Since September 11, 2001, LBG won several large [cost-plus][2] contracts for international reconstruction work in Afghanistan and Iraq," funded by the United States Agency for International Development ("USAID"). (IC ¶ 35). Compensation under a cost-plus contract is composed of reimbursement of direct costs and indirect costs, and payment of a fee. (IC ¶ 37).

In this case, LBG had a single cost pool ("AA") for expenses such as payroll, accounting, executive management, rent, and insurance. (IC ¶ 58). The AA pool was divided into international and domestic costs. (IC ¶ 59). International costs were composed of Government costs involving direct labor from United States citizens ("GG") and costs for international contracts involving direct labor of foreign nationals ("GF"). (IC ¶ 59-60). The Government relied on LBG's certifications for its GG and GF costs in 1998 and 2002 to negotiate "Billing Rates" from Fiscal Year 1998 to Fiscal Year 2006 for contract payments to LBG. (IC ¶ 67-72). The shaded cells depicted below reflect the billing rates for the aforementioned fiscal years:

| Fiscal Year | GG Rate Reported by LBG to Government in ICS | Billing Rate |
|---|---|---|
| 1998 | **144.20 percent** | 143.10 percent |
| 1999 | 146.60 percent | **144.20 percent** |
| 2000 | 146.90 percent | 144.20 percent |
| 2001 | 144.98 percent | 144.20 percent |
| 2002 | **143.51 percent** | **143.51 percent** |
| 2003 | 147.04 percent | 143.51 percent |
| 2004 | 147.66 percent | 143.51 percent |
| 2005 | 140.79 percent | 143.51 percent |
| 2006 | 148.30 percent[-] | 143.51 percent |

[3]

---

[2] "With cost-plus contracts, the Government relies on overhead rates reported by the contractor during contract negotiation to . . . calculate the amount of indirect costs payable by the Government." (IC ¶ 41). "For any given cost pool, an overhead rate may be calculated by dividing the total annual indirect costs collected in the cost pool (**Numerator**) by an 'allocation base'—a unit of measure common to all contacts covered by one, or a set of, cost pools (**Denominator**)." (IC ¶ 49) (emphasis in original). "If a final overhead rate is higher than the Billing Rate . . . the contractor may be entitled to additional payments from the Government." (IC ¶ 56). In this case, the Government alleges that Defendants falsely inflated costs collected in the "GG" cost pool to increase the overhead rate to over 140%.

[3] The Court notes that this grid is a copy from the Government's moving brief and was not created by the Court. Any errors contained therein and the footnote were in the original.

The Government alleges that Defendants "knowingly and falsely inflated" their overhead rates and, accordingly, "every claim for payment under a Government contract that relied on these rates constituted a false claim." (IC ¶ 73). According to the Government, Defendants "caused LBG to make thousands of such claims" between 2001 and 2006. (IC ¶ 73). For support, the Government points to claims submitted by LBG to USAID under a 2004 Iraq Vocational Training and Employment Services ("VTES") contract. (IC ¶ 35, 73). The table depicted below reflects a sample of invoices submitted by LBG to USAID:

**Exhibit B**

| VTES Invoice Number | Voucher Number | Invoice Date | Invoice Period | Billing Rate | Invoice Amount ($) | USAID Payment Amount ($) |
|---|---|---|---|---|---|---|
| 1 | 52670299 | 12/20/2004 | Oct.–Nov. 2004 | 143.51% | 548,398.86 | 516,104.86 |
| 2 | 52670455 | 1/21/2005 | Dec. 2004 | 143.51% | 1,100,906.86 | 1,100,906.86 |
| 3 | 52670686 | 2/18/2005 | Jan. 2005 | 143.51% | 1,580,576.27 | 1,580,576.27 |
| 4 | 52970694 | 3/17/2005 | Feb. 2005 | 143.51% | 1,489,599.02 | 1,489,599.02 |
| 5 | 52670840 | 4/18/2005 | Mar. 2005 | 143.51% | 1,169,063.70 | 1,169,063.70 |
| 6 | 52670979 | 5/20/2005 | Apr. 2005 | 143.51% | 1,539,200.88 | 1,537,201.68 |
| 7 | 52671136 | 6/17/2005 | May 2005 | 143.51% | 2,182,075.79 | 2,168,933.38 |
| 8 | 52671424 | 7/27/2005 | June 2005 | 143.51% | 1,785,775.39 | 1,785,775.39 |
| 9 | 52671582 | 8/29/2005 | July 2005 | 143.51% | 2,082,361.30 | 2,082,361.30 |
| 10 | 62670118 | 9/29/2005 | Aug. 2005 | 143.51% | 2,299,961.24 | 2,299,961.24 |
| 11 | 62670203 | 10/27/2005 | Sept. 2005 | 143.51% | 2,567,709.61 | 2,567,709.61 |
| 12 | 26706122TD | 11/30/2005 | Oct. 2005 | 143.51% | 1,843,237.36 | 1,843,237.36 |

The Government further alleges that Defendants "conspired to bill indirect costs ... at falsely inflated overhead rates." (IC ¶ 78-79). The Government also asserts that Defendants falsified their "overhead rate statements/proposals, Billing Rate proposals, and related cost accounting data," by allocating indirect costs directly to the GG pool and manipulating costs in the allocation base of the overhead rate. (IC ¶ 79-80).

Under the Federal Acquisition Regulation and the terms of LBG's contracts, "LBG may directly allocate indirect costs to the GG cost center only if: (a) such costs were incurred

4

specifically and exclusively in support of GG work, and (b) LBG has not indirectly allocated other such costs, incurred for the same purpose in like circumstances, to the GG cost center through the AA allocation procedure." (IC ¶ 81). However, the Government alleges that Defendants "conspired to violate this requirement" through "improper use of accounting codes GG997A and GG997B" in two ongoing costs schemes. (Id.).

The first alleged scheme occurred in LBG's East Orange headquarters in New Jersey through the GG997A accounting code. The GG997A code was created to "capture costs" incurred by the headquarters "that specifically and exclusively benefitted LBG's international Government contracts." (IC ¶ 82). Indirect costs that benefitted all of LBG's divisions, such as salaries for executive management and corporate labor, should have gone to the AA pool first and then allocated to GG997A in proportion to the direct labor used on GG contracts. (IC ¶ 83). The Government further asserts that Defendants conspired to use GG997A to "charge the Government more than its fair share of corporate headquarters costs." (IC ¶ 83). The Government specifically alleges that Defendants and Pellettieri billed time to GG997A, despite the fact that they did not spend all of their time working exclusively on GG contracts, and instructed their subordinates who worked in the headquarters, including Salomon, to "do the same." (IC ¶ 84).

The Government also alleges that "[i]n addition to improperly billing time to GG997A, Defendants and their co-conspirators reclassified time that had been properly billed to AA." (IC ¶ 85). Specifically, Defendants allegedly moved hours "billed by corporate headquarters employees from AA to GG997A, even though the hours had not been devoted exclusively to GG [related] work." (Id.). The reclassification was done through an accounting method known as a "journal entry" on a periodic basis without LBG's employees' knowledge or consent. (Id.).

5

Defendant Wolff argues that he "narrowly tailored his admitted conduct" in his guilty plea to questions which dealt exclusively with "the 2003 to 2006 journal entries that reclassified the work hours of some LBG employees" and did not admit to allegations outside the Superseding Information. (ECF No. 170 at 2-4). Defendant also contends that the 2003 to 2006 journal entries, although used to calculate Government overhead rates, "were ***not used on any invoices submitted to the Government or used to bill the Government.***" (ECF No. 170 at 5) (emphasis in original).

The Government claims that Defendant Wolff's allegedly fraudulent conduct was "more extensive" between 2001 to 2003. (IC ¶ 86). The Government asserts that Defendant Wolff charged "hundreds of hours of his time directly to the Government via GG997A while charging most or all of the remainder of his time to AA." (IC ¶ 86:a). Additionally, the Government contends that Defendant Wolff and Defendant Pepe, along with Pellettieri, communicated several times on ways to get the "target" GG rate over 140 percent via reclassification of employee work hours (including their own) in the corporate headquarters. (IC ¶ 86:b-g). These policies allegedly included redirecting hundreds of costs from GF to GG and reclassifying dozens of LBG's non-GG indirect costs, including "payroll taxes" and "employee benefits" from AA to GG997A. (IC ¶ 86:i-89).

Additionally, the Government asserts that, "on instructions from [Defendant] Wolff in or around 2001," Defendants in LBG's Washington, D.C. office engaged in a second scheme by charging rent, telephone bills, and office supplies costs to GG contracts through the accounting code GG997B. (IC ¶ 90). The Government argues that "[l]ike the GG997A scheme, the GG997B scheme falsely inflated LBG's GG Rates, Billing Rates, invoices and vouchers, and ultimately, LBG's recovery of indirect costs from the United States." (IC ¶ 93). Furthermore, the Government alleges that Defendants conspired to inflate the GG rate by improperly manipulating the "allocation

base" of GG and GF cost pools. (IC ¶ 94-97). Defendants "disproportionally sub-allocated" costs to GG and GF rates by removing short-term consultant fees from the "[d]omestic allocation base" and adding "direct local labor costs" to the GF base. (IC ¶¶ 98-100). To further decrease GG costs, Defendants used general ledger accounts titled "Labor Does Not Drive Overhead" and "Consultant Don't Drive OH" to conceal direct labor costs. (IC ¶ 101). Lastly, Defendant Pepe allegedly "experimented" with the GG Rate equation to create 12 unique GG rates at the "desired level of 145%" for the GG rate. (IC ¶¶ 102-103).

The Government claims that Defendants' submission of allegedly false GG rates and general allocation bases in the two alleged schemes was "material to the Government's payment of LBG's falsely inflated invoices and vouchers." (IC ¶ 105). Hence, LBG's manipulation of billing rate proposals induced the United States "to agree to falsely inflated" rates. (IC ¶ 106-107). Moreover, Defendants allegedly "ensured that the Government would not be motivated to revise the prevailing Billing Rate" by reporting GG Rates consistently around 140 percent. (IC ¶ 110). The Government contends that if USAID had known that when "properly calculated, those rates would have been well below 140 percent" it would have paid "millions less for LBG's services." (IC ¶ 108, 111).

Defendants also allegedly "knew that these false claims, statements, and records were material to the Government's payment of LBG." (IC ¶ 112). To support its position, the Government cites Defendants' guilty pleas as well as Defendants' routine discussions of ongoing GG allocation at meetings of senior management and board members. (IC ¶ 114-116). For example, the Government contends that there was an alleged meeting where Defendant Pepe presented a GG rate below 140 percent and Defendant Wolff disparaged Defendant Pepe as a "GG assassin." (IC ¶ 117).

7

In 2004, USAID placed pressure on LBG to prepare a disclosure report on LBG's compliance with the Government's Cost Accounting Standards ("CAS") for cost-plus contracts. (IC ¶ 44, 118). In response, a memorandum was distributed for an operating committee meeting on December 2004 which allegedly warned Defendant Wolff that submitting a disclosure report would put LBG's GG997B scheme "at risk" and result in a decrease of "$960,000 for the GG rate calculation." (IC ¶ 118). Subsequent memos on LBG's indirect cost accounting schemes were prepared with Defendant Pepe's assistance for operating committee meetings. (IC ¶ 119). A memo prepared for a 2005 operating committee and titled "Management Structure in a CAS Environment" stated that "LBG runs the risk of not recovering $4.9 million of its GG overhead" if they fully complied with CAS. (IC ¶ 120).

A future memo prepared for a 2006 operating committee meeting and titled "Overhead Recovery" recognized that LBG would likely only have "partial success" in "defending GG997A and GG997B." (IC ¶ 121). In response, Defendant Wolff, and others, allegedly decided at an operating committee meeting to withdraw LBG's Incurred Cost Submission ("ICS"), which detailed the indirect costs incurred for the preceding fiscal year and proposed an overhead rate for that same year. (IC ¶ 53, 123). The Government asserts that the potential financial impact of the issue of "overhead recovery" was estimated at $18 million at the time of LBG's ICS withdrawal. (IC ¶ 123).

The Government alleges that a subsequent memo titled "Louis Berger Overhead Recovery Issues" was prepared for a board of directors meeting in 2007. (IC ¶ 124). The memo stated that: (a) "it did not appear that LBG had made any effort 'to develop systems to assure accurate reporting of GG charges so that alterations would be unnecessary;' (b) 'senior management instituted a procedure of altering the time charges' . . . 'after the fact without employees'

knowledge'" to maintain a "140% GG rate;" and (c) "no more than a third" of GG997B charges "could be legitimately charged to GG." (IC ¶ 125). The memo allegedly concluded with a statement from LBG's chief operating officer stating that Defendant Wolff "directed all GG charges." (Id.).

Accordingly, the Government has partially intervened in this action asserting the following claims: Count I – Conspiracy in violation of the False Claims Act, 31 U.S.C. § 3729(a)(3); Count II – False Claims in violation of 31 U.S.C. § 3729(a)(1); Count III – False Statements in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B); and, Count IV – Reverse False Claims in violation of 31 U.S.C. § 3729(a)(7).

In his answer and affirmative defenses, Defendant Wolff contends that the Government "deliberately delayed the unsealing of the complaint in this action for some 10 years . . . ." (ECF No. 169 at 1). Defendant argues that, in 2009, the Government "forced [Defendant] Wolff to remove himself from any business activity involving the Government under the threat that LBG would be debarred from getting Government work if he refused." (ECF No. 169 at 3). Defendant further alleges that in 2010, the Government demanded that Mr. Wolff be terminated from LBG. (Id.). Once Mr. Wolff was terminated, the Government allegedly took improper steps to seize Defendant Wolff's assets "to be paid to him upon his separation from LBG . . ." (Id.).

Defendant claims that, in 2011, "the Government formally notified Mr. Wolff that he was a target of its criminal investigation, and offered him a pre-indictment guilty plea, which he rejected." (Id.). On October 13, 2013, "Government civil attorneys, not Salomon, conducted a meeting with Mr. Wolff's attorneys to advocate its view of the civil *qui tam* claims and to present a settlement offer of $16 million in civil damages." (Id.). Defendant alleges that, on April 26,

2016, the Government requested that sealed documents, including its applications for sealing extensions, remain under seal to "shield its improper conduct" from Defendant Wolff. (Id.).

## II.    LEGAL STANDARD

### A. Strike Affirmative Defenses

In resolving a motion to strike defenses pursuant to Rule 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). In doing so, the Court may act: "(1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 20 days after being served with the pleading." (Id.).

"[C]ourts recognize that a motion to strike can save time and litigation expense by eliminating the need for discovery with regard to legally insufficient defenses." *F.D.I.C. v. White*, 828 F. Supp. 304, 307 (D.N.J. 1993); *see also United States v. Geppert Bros.*, 638 F. Supp. 996, 998 (E.D. Pa. 1986). In this regard, courts have stricken affirmative defenses as legally insufficient where the arguments raised therein had previously been addressed and rejected by that court. *See, e.g., AMEC Civil, LLC v. DMJM Harris, Inc.*, 2007 U.S. Dist. LEXIS 8344 (D.N.J. Feb. 6, 2007). Nevertheless, the Third Circuit has cautioned that courts "should not grant a motion to strike a defense unless the insufficiency of the defense is 'clearly apparent.'" *Cipollone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986); *see also United States ex rel. Spay v. CVS Caremark Corp.*, 2013 U.S. Dist. LEXIS 58273 (E.D. Pa. Apr. 24, 2013). In light of this standard, "motions to strike are not favored and will typically be denied *unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the*

*allegations confuse the issues in the case.*" *AMEC Civil, LLC*, 2007 U.S. Dist. LEXIS 8344, at *13 (quotation omitted) (emphasis added).

**B. Judgment on the Pleadings**

Pursuant to Rule 12(c), the movant for judgment on the pleadings must establish: 1) that no material issue of fact remains to be resolved; and 2) that he is entitled to judgment as a matter of law. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See Rosenau*, 539 F.3d at 221. Hence, a motion made pursuant to Rule 12(c) should not be granted "*unless the moving party has established that there is no material issue of fact to resolve*, and that it is entitled to judgment as a matter of law." *Perez v. Griffin*, 304 F. App'x 72, 74 (3d Cir. 2008) (citing *Mele v. FRB*, 359 F.3d 251, 253 (3d Cir. 2004)) (emphasis added). In resolving such motions, that Court may also consider: 1) items attached to the complaint; 2) those matters referenced in the complaint; 3) matters of public record; and 4) matters integral to or upon which a plaintiff's claim is based. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). With this framework in mind, the Court turns now to the Government's arguments.

### III. ANALYSIS

**A. Motion to Strike Affirmative Defenses**

The Government's Motion for Partial Judgement on the Pleadings relies, in part, on the success of its Motion to Strike Defendant's Fifth, Sixth, and Seventh Affirmative Defenses. Therefore, the Court will first address the Government's Motion to Strike. For the following

11

reasons, the Government's Motion to Strike Defendants Affirmative Defenses is denied.

To bring an affirmative defense, a Defendant must provide an argument which is not "redundant, immaterial, impertinent, or scandalous . . . ." Fed. R. Civ. P. 12(f). In this case, Defendant Wolff asserts in his Fifth Defense that the Government's failure to timely unseal the docket was purposefully done to gain improper advantages over Defendant. (ECF No. 169 at 5). Defendant specifically alleges that by purposefully keeping the docket sealed, the Government obtained "one-sided discovery", negotiated an eight-figure settlement, and kept Defendant "unaware of the allegations against him . . . ." (Id.). In addition, Defendant claims in his Seventh Defense that the Government's procedural misconduct precludes application of the "relation back provision" of the FCA and bars the Government's claims. (Id.).

At this juncture in the pleadings, the Court must accept that the Defendant's factual allegations are of similar weight to the Government's contentions in the Intervenor Complaint. While the Government believes Defendant Wolff's defenses are "ripe for striking," this Court finds that the facts alleged by Defendant are material and, if proved, would possibly preclude Defendant from being subject to liability. (ECF No. 156-1 at 3). If Defendant can prove through discovery that the Government engaged in procedural misconduct or failed to afford Defendant due process, then Defendant can provide a plausible defense to the Government's civil FCA action. This is a material fact that must be fleshed out during discovery. Therefore, the Court will not strike any of the affirmative defenses at this juncture.

### B. Motion for Partial Judgment on the Pleadings

As noted above, for a motion for judgment on the pleadings under Rule 12(c), the movant must establish that: (1) the movant is entitled to judgment as a matter of law; and (2) there are no material issues of fact which remain to be resolved. *See Rosenau*, 539 F.3d at 221. In resolving a

motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See Rosenau*, 539 F.3d at 221.

The Government asserts, in part, that it is entitled to Partial Judgement on the Pleadings because Defendant's affirmative defenses are insufficient to stand against a Motion to Strike. While the Government argues that it has "demonstrated the hollowness of any of [Defendant] Wolff's defenses," this Court found that Defendant's affirmative defenses were, at this junction, sufficient to survive the Government's Motion to Strike. (ECF No. 178 at 2). Therefore, the existence of Defendant's affirmative defenses is alone sufficient to overcome the Government's motion for judgment on the pleadings.

While the Government asks the Court to recognize the preclusive effect of Defendant Wolff's prior criminal conviction as to Wolff's civil liability on Count One of the Complaint, the Court finds that there are two genuine issues of fact regarding the scope of Defendant's guilty plea. (ECF No. 178 at 1-2). The Government argues in Count I of the Intervenor Complaint that Defendant Wolff conspired "from at least July 1, 2000 through June 30, 2006," to present false claims for Government contracts in violation of the FCA. (IC ¶ 129). In contrast, Defendant contends that he only admitted in the Superseding Information to "knowingly and intentionally" conspiring to defraud the United States "as early as in or about 2003 through in or about 2006 . . . ." (ECF No. 162-1 at 1). Clearly, there is a discrepancy in the accounts between the two parties regarding the time period Defendant allegedly began presenting false claims for Government contracts in violation of the FCA ("at least July 1, 2000" compared with "in or about 2003"). (ECF No. 162-1, at 1) (IC ¶ 129). These factual discrepancies are material facts that cannot be resolved without further litigation.

An additional issue of fact exists regarding Defendants' allegedly fraudulent use of journal

entries. The Government avers that Defendants Wolff and Pepe, along with Pellettieri, improperly "reclassed hundreds" of costs which caused the Government to pay LBG "tens of millions of dollars to which it was not entitled." (IC ¶ 8, 86-89). However, Defendant Wolff contends that these journal entries were ""*not used on any invoices submitted to the Government or used to bill the Government.*" (ECF No. 170 at 5) (emphasis in original). It is critical for the Court to understand which of these contrasting allegations is true before determining whether to apply civil penalties under the FCA to Defendant Wolff's use of journal entries. Hence, because the Government's Motion for Partial Judgment on the Pleadings, in part, relies on the success of its Motion to Strike, and because both parties have raised issues of genuine fact which have yet to be resolved, the Court denies the Government's Motion for Partial Judgment on the Pleadings.

## IV. CONCLUSION

For the aforementioned reasons, the Government's Motion to Strike Defenses (ECF No. 156) and Motion for Partial Judgment on the Pleadings (ECF No. 162) are hereby denied. An appropriate Order accompanies this Opinion.

DATED: July 11, 2018

JOSE L. LINARES
Chief Judge, United States District Court