**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. HAROLD SALOMON,** | |
| Plaintiff, | Civil Action No.: 2:17-cv-05456-ES-CLW |
| v. | **OPINION** |
| **DERISH M. WOLFF,** | **FILED UNDER SEAL** |
| Defendant. | **NOT FOR PUBLICATION** |

## I.    Introduction

This matter comes before the Court on the motions of (i) defendant Derish M. Wolff ("Wolff"), D.E. 243; and (ii) plaintiff United States of America ex rel. Harold Salomon (the "Government"), D.E. 244. Both motions grow from three of Wolff's affirmative defenses in which he contends that this False Claims Act matter should be dismissed as against him because the Government has committed prosecutorial misconduct and deprived him of his due process rights. See D.E. 143 at Fifth, Sixth, and Seventh Separate Defenses (the "Affirmative Defenses").

Wolff's motion seeks an order under FED. R. CIV. P. 37 compelling production of certain documents withheld by the Government on the basis of the attorney-client privilege and/or as attorney work product. Wolff contends he is entitled to these materials in order to prove the Affirmative Defenses. He argues that the Government's asserted privileges do not apply to the materials at issue, and that even if the privileges did apply, they would be pierced by the crime-fraud exception. The Government has opposed Wolff's motion [D.E. 253], and Wolff has filed a reply [D.E. 261].

The Government's motion seeks an order compelling Wolff to produce a privilege log concerning communications between and among Wolff and his attorneys which the Government

contends bear upon the Affirmative Defenses, and which Wolff has withheld on privilege grounds. Wolff has opposed the Government's motion [D.E. 252], and the Government has filed a reply [D.E. 258]. The Court heard oral arguments on both motions on December 4, 2020.

For the reasons discussed below, the Court grants in part and denies in part both motions: Wolff's motion is granted to the extent that the Court will order a sampling of the requested documents to be produced to the Court for in camera inspection.[1] The Government's motion is granted to the extent that Wolff will be ordered to produce a privilege log of materials that are relevant to the Affirmative Defenses. The motions are denied in all other respects.

## II.  Background

### a.  Relevant False Claims Act Provisions

The False Claims Act (the "FCA"), codified at 31 U.S.C. §§ 3729-03, provides a mechanism for prosecuting fraud committed against the federal government. A private person may bring an FCA claim on behalf of the government. See 31 U.S.C. § 3730(b)(1). Complaints in such actions—known as qui tam actions—"shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." Id. at § (b)(2). The Government initially has sixty days from receipt of a qui tam complaint "to intervene and proceed with the action"; however, "[t]he Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal," whereupon the Government must decide before the expiration of the court-ordered extension(s) whether it will intervene. Id. at §§ (b)(2)-(4).

---

[1] The Court will also direct the parties to advise of certain developments in the Government's document production, should they arise. See infra.

### b.  The <u>Qui</u> <u>Tam</u> Complaints

On July 31, 2006, Relator Harold Salomon ("Salomon") filed in the United States District Court for the District of Maryland a sealed <u>qui tam</u> complaint against Berger Group Holdings, Inc.; Louis Berger Group, Inc.; and Louis Berger Group (Domestic) (collectively and interchangeably, "LBG"). <u>See</u> 8:06-cv-1970-RWT (D. Md. 2006), D.E. 2. LBG is an engineering consulting and construction firm with more than 3,000 employees across 140 offices around the world. <u>Id.</u> at ¶¶ 34-36. Salomon worked for LBG as a Senior Financial Analyst/Auditor from March 2002 through October 2005, at which time he resigned because of his objection to perceived improprieties in LBG's accounting practices. <u>See</u> <u>id.</u> at ¶¶ 13, 17.

In July 2009, Salomon amended his complaint to, <u>inter</u> <u>alia</u>, name Wolff as a defendant. <u>See</u> D.E. 18 (the original and amended complaints collectively referred to as the "<u>Qui</u> <u>Tam</u> Complaint"). Wolff was LBG's President and CEO from 1982 through 2002, and its Chairman from 2002 through 2010. <u>Id.</u> at ¶ 26; D.E. 156-2 at 26. Broadly, the <u>Qui</u> <u>Tam</u> Complaint alleges that LBG defrauded the United States Government and the states of Massachusetts, Nevada, and Virginia in connection with contracts for construction, engineering, and environmental projects in the United States and abroad from approximately 1992 through 2006. <u>Id.</u> at ¶¶ 3, 48; <u>see</u> <u>generally</u> <u>id.</u>

In April 2016, the Government informed the Maryland district court of its election to intervene in, <u>inter</u> <u>alia</u>, the portion of Salomon's action that asserted claims against Wolff. D.E. 79.[2] This decision came after nearly ten years of the Government filing, at six-month intervals, approximately twenty statutorily-mandated applications (each of which was granted by the

---

[2] The Government previously had intervened in a portion of the action concerning The Louis Berger Group, Incorporated. <u>See</u> 8:06-cv-1970-RWT (D. Md. 2006), D.E. 29.

Maryland court) seeking to maintain the seal on the <u>Qui Tam</u> Complaint so that the Government could have more time to decide whether to intervene in the action against Wolff. <u>See</u> 31 U.S.C. § 3730(b)(2)-(3); D.E. 269. Also in April 2016, the Government requested to unseal the <u>Qui Tam</u> Complaint and advised that it intended to file its own complaint, which it did in July 2016. <u>See</u> D.E. 79, 83. The Government's Complaint-in-Intervention named as defendants Wolff and Salvatore Pepe, who was LBG's Controller from 2000 to 2006 and Chief Financial Officer from 2006 to 2009. D.E. 83; <u>id.</u> at ¶ 21.[3] In July 2017, the matter was transferred to this Court. <u>See</u> D.E. 127.

### c. Wolff's Affirmative Defenses

The thrust of Wolff's prosecutorial misconduct/due process defenses is that the Government abused the procedure set forth in § 3730(b). Wolff argues the Government's actions were improper because, contrary to the Government's representations to the Maryland court from 2006 through 2016 that it was agnostic as to its involvement in the case against Wolff, during these ten years the Government was deeply involved in—indeed, orchestrating—the prosecution of this action, thereby obtaining and maintaining "enormous tactical advantages of 10 years of unchecked discovery." D.E. 243 at 14. Wolff's defenses more specifically state:

> This action should be dismissed based on the United States' prosecutorial misconduct, including, without limitation, its failure and refusal to timely unseal the docket and filings in this action in order to gain improper advantages over Mr. Wolff by, among other things, (i) obtaining one-sided discovery pertinent to this action; (ii) attempting to negotiate an eight-figure settlement of this action while keeping Mr. Wolff unaware of the allegations against him; (iii) improperly keeping the complaint under seal in order to "pick off" defendants seriatim; and (iv) without affording Mr. Wolff any due process, taking steps to deprive Mr. Wolff of his livelihood and his eight-figure ownership interest in the company he helped found.

---

[3] Pepe was a named defendant in Salomon's Amended Complaint, as was Nicholas Masucci, who was LBG's President and CEO beginning in 2002. D.E. 18 at ¶ 27.

*********************************************************

> This action should be dismissed based on the United States' unlawful violation of Mr. Wolff's rights under the Fifth Amendment to the United States Constitution not to be deprived of life, liberty, or property, without due process of law, including, without limitation, through the misconduct by the United States alleged in the Fifth Separate Defense, above.

*********************************************************

> The United States' claims in this action are barred by the statutes of limitations set forth in the False Claims Act, 31 U.S.C. § 3731, because the United States' misconduct alleged in the Fifth and Sixth Separate Defenses above precludes application of the relation back provision of 31 U.S.C. § 3731(c) to the Complaint in this action, which was served on Mr. Wolff more than 6 years (and, as to most of the allegations, more than 10 years) after the date on which the alleged violations of the False Claims Act were committed, and more than 3 years after the date when facts material to the right of action were known or reasonably should have been known by the official(s) of the United States charged with responsibility to act in the circumstances.

D.E. 143, Fifth, Sixth, Seventh Separate Defenses. The Government's purported control over the litigation during the ten years at issue includes, without limitation, the Government taking the following alleged actions: interviewing Salomon about the allegations in the Qui Tam Complaint beginning in early 2006; extensive internal email correspondence regarding this action; executing a search warrant at LBG offices; corresponding with LBG counsel regarding the allegations against LGB and conditions for settlement; corresponding with Salomon's attorneys; negotiating a settlement with LBG; forcing Wolff out from his position with LBG; and taking discovery from LBG and its attorneys. See generally D.E. 243 at 6-17; D.E. 243-2 and exhibits thereto.

Significantly, in July 2018 the Honorable Jose L. Linares denied the Government's motion to strike the Affirmative Defenses, writing that "[i]f Defendant can prove through discovery that the Government engaged in procedural misconduct or failed to afford Defendant due process, then

Defendant can provide a plausible defense to the Government's civil FCA action. This is a material fact that must be fleshed out during discovery." D.E. 194 at 12.

Relying heavily on Judge Linares's decision, Wolff now argues that he is entitled to Government documents—claimed by the Government to be privileged—that Wolff believes will prove the Affirmative Defenses. The Government in its motion argues that certain materials that Wolff has withheld on privilege grounds will disprove these same defenses, and that Wolff therefore should be compelled to produce a privilege log in connection therewith. The Court considers each motion in turn, beginning with Wolff's.

### III.  Wolff's Motion

#### a.  Legal Standard and Scope of Motion

Wolff's motion proceeds under FED. R. CIV. P. 37 which, in relevant part, permits a party to "move for an order compelling an answer, designation, production, or inspection . . . if . . . a party fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34." FED. R. CIV. P. 37(a)(3)(B)(iv). Wolff seeks an order compelling production of a variety of items withheld by the Government on the basis of privilege, and similar communications relating to this action which predate the Government's July 28, 2016 Complaint-in-Intervention. See D.E. 243.

#### b.  Analysis

The threshold issue in Wolff's motion is the viability vel non of the Affirmative Defenses, regarding which, as noted, Judge Linares has held that Wolff is entitled to discovery. This ruling constitutes the law of the case, a doctrine that dictates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Bellevue Drug Co. v. CaremarksPCS (In re Pharmacy Benefit Managers Antitrust Litig.),

582 F.3d 432, 439 (3d Cir. 2009) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983)). Accordingly, the Court presumes for purposes of this motion that Wolff is entitled to discovery to support the Affirmative Defenses.

Wolff's motion raises three substantive issues: the attorney-client privilege, the work product doctrine, and the crime-fraud exception. The Court considers each in turn.

### i. Attorney-Client Privilege

As explained by the Third Circuit:

> The attorney-client privilege protects communications between attorneys and clients from compelled disclosure. It applies to any communication that satisfies the following elements: it must be (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation.

<u>Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)</u>, 493 F.3d 345, 359 (3d Cir. 2007) (quoting <u>Restatement (Third) of the Law Governing Lawyers</u> §§ 68, 70 (2000)) (citation and quotation marks omitted); <u>e.g.</u>, <u>IQVIA, Inc. v. Veeva Sys.</u>, 2020 U.S. Dist. LEXIS 74166, at *4 (D.N.J. Apr. 28, 2020) (same) (quoting <u>Teleglobe</u>). Any privileged attorney-client communication is not discoverable. <u>Teleglobe</u>, 493 F.3d at 359-60. The Supreme Court has explained that the privilege exists to "encourage full and frank communication" between attorney and client and "thereby promote broader public interests in the observance of law and administration of justice." <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981). "The burden of proving that the attorney-client privilege applies is placed upon the party asserting the privilege." <u>In re Grand Jury</u>, 705 F.3d 133, 160 (3d Cir. 2012) (quoting <u>In re Grand Jury Empanelled February 14, 1978</u>, 603 F.2d 469, 474 (3d Cir. 1979)).

Wolff's primary argument is that the privilege does not apply here because the communications at issue were made either (i) among government attorneys; or (ii) between government attorneys and Salomon's counsel. Wolff contends that because the privilege protects only those communications made between an attorney and a client, the requested materials fall beyond the rule's protection. The Court finds this argument to be without merit.[4]

### 1. Inter-Attorney Communications

As a general matter, the attorney-client privilege plainly applies to inter-attorney communications. As explained in <u>Smithkline Beecham Corp. v. Apotex Corp.</u>, 232 F.R.D. 467 (E.D. Pa. 2005),

> [t]here is no bar to extending attorney-client privilege to inter-attorney communications. To the contrary, privilege also attaches . . . to inter-attorney communications . . . which include legal advice or confidential information received from the client. Limiting attorney-client privilege on these grounds would merely penalize[] those attorneys who write or consult with additional counsel representing the same client for the same purpose. As such it would make a mockery of both the privilege and the realities of current legal assistance.

---

[4] Before proceeding to Wolff's main argument, the Court briefly addresses two other points referenced in Wolff's papers. First, Wolff contends that the Government's privilege log fails to explicitly identify the "client" upon whom the claimed attorney-client privilege is premised. The Court agrees with the Government that, in view of the circumstances surrounding the case, it is quite clear that the United States is the client identified in the log.

The Court similarly rejects the notion that—setting aside the issue (referenced above and discussed immediately below) of who received the communications at issue—the log falls short of demonstrating that the communications' purpose was to provide (or obtain) legal advice. To the contrary, each and every entry on the log states as a basis for privilege some iteration of "providing information in furtherance of a request for legal advice." <u>See</u> D.E. 243-3, Exhibit A; <u>cf.</u> <u>Hepburn v. Workplace Benefits, LLC</u>, 2014 U.S. Dist. LEXIS 196983, at *11-12 (E.D.N.C. Apr. 18, 2014) (upholding privilege where "[e]ach of the documents in dispute is described as some slight variation on the following: 'email from employee to employee and counsel seeking information necessary for counsel's provision of legal advice.' It is therefore plain from the descriptions of the documents that the communications at issue were created for the purpose of either receiving or acting upon legal advice" and party opposing privilege offered only speculation that emails were not for purpose of providing legal advice). Although this question will require <u>in camera</u> review to be answered definitely, for present purposes, the Court credits the Government's privilege log as sufficiently demonstrating that the communications described therein concern the provision of legal advice.

Id. at 481 (citations and quotation marks omitted); see also In re U. S. Healthcare, Inc. Sec. Litig., 1989 U.S. Dist. LEXIS 1043, at *3 (E.D. Pa. Feb. 7, 1989) (the "privilege also attaches . . . to inter-attorney communications . . . which include legal advice or confidential information received from the client"); Cedrone v. Unity Sav. Ass'n, 103 F.R.D. 423, 429 (E.D. Pa. 1984) ("It is inconceivable that an internal memorandum between attorneys . . . concerning the representation of a client, utilizing confidential information provided by that client, could be anything but protected by the privilege."); accord Natta v. Zletz, 418 F.2d 633, 637 n.3 (7th Cir. 1969) ("Insofar as inter-attorney communications or an attorney's notes contain information which would otherwise be privileged as communications to him from a client, that information should be entitled to the same degree of protection from disclosure."). To this end and as noted, the Third Circuit has made clear that the privilege applies to communications made "between privileged persons," which include the client and the client's lawyer. Teleglobe, supra (quoting Restatement (Third) of the Law Governing Lawyers, §§ 68, 70) (emphasis added). Thus, the attorney-client privilege protects attorney-to-attorney communications.

There is some authority supporting the notion that the privilege applies more narrowly to government lawyers than to those in private practice, a concept owing to the different roles and responsibilities of government, as opposed to private, lawyers. As explained by the D.C. Circuit,

> [w]ith respect to investigations of federal criminal offenses, . . . government attorneys stand in a far different position from members of the private bar. Their duty is not to defend clients against criminal charges and it is not to protect wrongdoers from public exposure. . . . Unlike a private practitioner, the loyalties of a government lawyer therefore cannot and must not lie solely with his or her client agency.

In re Lindsey, 158 F.3d 1263, 1272-73 (D.C. Cir. 1998).

Notwithstanding, Wolff seeks to constrict the privilege more narrowly than is appropriate. For example, he cites the statement in United States v. Jicarilla Apache Nation, 564 U.S. 162

(2011) that "the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys," id. at 170, to suggest that the government may invoke the privilege only to protect communications between government officials and attorneys. See D.E. 243-1 at 24. This is a misconstruction of Jicarilla, in which the Court was not limiting the privilege's scope, but instead explaining that "[t]he objectives of the attorney-client privilege apply to governmental clients," and therefore that the privilege extends to the governmental arena. See 564 U.S. at 169-70; see also Restatement (Third) of the Law Governing Lawyers, § 74 (equating privilege for governmental employees or agencies to that applicable to private persons or agencies); id. cmt. b. ("[C]ourts generally have construed . . . whistle-blower . . . statutes as subject to the attorney-client privilege . . . . [T]he generally prevailing rule [is] that governmental agencies and employees enjoy the same privilege as nongovernmental counterparts . . . ."). Wolff likewise misses the mark in his interpretation of the statement in Coastal Corp. v. Duncan, 86 F.R.D. 514 (D. Del. 1980) that, while the privilege attaches to government attorney-to-government agency communications, it "is still limited to confidential communications between attorney and client for the purpose of giving or receiving legal advice." Id. at 520. The operative word in Duncan is "still"—read in context, the passage instructs that the privilege is afforded no additional leniencies in the governmental sphere; not, as Wolff suggests, that the privilege somehow is limited here to exclude attorney-to-attorney communications, a notion dispelled by the substantial authority to the contrary. See supra.

In sum, while the attorney-client privilege may apply somewhat more narrowly in the governmental domain due to the policy considerations cited above, Wolff has not demonstrated, nor does our case law hold, that the privilege is so constricted so as to be eradicated when applied to communications amongst government attorneys. The Court therefore concludes that the

privilege protects from disclosure the communications between Government attorneys withheld by the Government on attorney-client privilege grounds.[5]

## 2. Communications Between Government Attorneys and Salomon's Counsel

Wolf also argues that the attorney-client privilege should not protect communications between Government attorneys and Salomon's counsel. This argument likewise fails in light of the common-interest doctrine (also known as the community-of-interest doctrine or joint-prosecution privilege), which "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." Teleglobe, 493 F.3d at 364.[6] "[T]he privilege protects communications made between attorneys when all members of the

---

[5] To the extent Wolff claims the privilege should not attach to communications with members of non-DOJ government entities, the Restatement instructs that "[c]ommunications between a lawyer representing one governmental agency and an employee of another governmental agency are privileged . . . if the communication is pursuant to a common-interest arrangement. Restatement (Third) of the Law Governing Lawyers, § 74 cmt. b. (citing id. § 76). Because, as discussed below, the common-interest exception applies here, this argument fails.

[6] It is noted that some federal courts have declined to rely on certain aspects of Teleglobe's common-interest discussion, noting that the Third Circuit there applied Delaware state law. See, e.g., AgroFresh Inc. v. Essentiv LLC, 2019 U.S. Dist. LEXIS 172423, at *11 n.2 (D. Del. Oct. 4, 2019) (citing cases to this effect). However, the Court agrees with the assessment in Hoffmann La Roche, Inc. v. Roxane Labs., Inc., 2011 U.S. Dist. LEXIS 50404 (D.N.J. May 11, 2011) that these cases

> short-change[] Teleglobe by emphasizing it is a Delaware law case and implying it has limited import beyond its facts. While Teleglobe was a case applying Delaware law, its discussion of the common-interest doctrine was not so limited. The Third Circuit engaged in a contemplative analysis of the purpose, history, and requirements of the common-interest doctrine, without much reference to Delaware law at all. And the opinion has not been narrowly construed by other courts. In fact, Teleglobe has been cited by courts around the country as a leading opinion on the common-interest doctrine. It is not an outlier decision interpreting a finite point of Delaware law. Rather, Teleglobe has been recognized by other courts as a proper statement of the common-interest doctrine's requirements. Thus, this Court follows Teleglobe in this case.

Id. at *17-19 n.6 (citations omitted).

community share a 'common legal interest' in the shared communication." La. Mun. Police Emples. Ret. Sys. v. Sealed Air Corp., 253 F.R.D. 300, 309 (D.N.J. 2008) (quoting Teleglobe, 493 F.3d at 364 and citing Paul Rice, Attorney-Client Privilege in the United States § 4:35 (2007)). The parties' legal interests need not be identical, so long as they are "at least . . . substantially similar." Id. (quoting Teleglobe, 493 F3.d at 364 and citing Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 174 F.R.D. 609, 634 (M.D. Pa. 1997)). The common interest privilege applies only where an underlying privilege—such as the attorney-client privilege or attorney work product— has been established. See id. (citing Andritz Sprout-Bauer, 174 F.R.D. at 624).

Courts generally hold that the common-interest privilege applies between government and relator counsel who share common interests in prosecuting a qui tam defendant. See, e.g., Miller v. Holzmann, 240 F.R.D. 20, 21 (D.D.C. 2007) ("On the day of the disclosures, relator had already filed the qui tam action and the Antitrust Division had commenced its investigation.[7] . . . Thus, the United States and the relator had a common interest in the prosecution of common defendants in an existing civil or criminal case or both."); United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., 2004 U.S. Dist. LEXIS 18747, at *20 (D.D.C. May 17, 2004) ("The communications between Relator Pogue and the United States, through their respective counsel, are further protected by the common interest privilege. Consistent with successful application of the privilege, the communications between Relator Pogue and the United States were . . . for the purpose of furthering their common interest in holding the defendants legally responsible for violating the FCA . . . . As such, the common interest privilege is also applicable to this case . . ."); United States ex rel. Purcell v. MWI Corp., 209 F.R.D. 21, 27 (D.D.C. 2002) ("[I]n FCA cases in which the

---

[7] Here too, the qui tam action and the government investigation had commenced at the time of the disclosures at issue.

government intervenes, a joint-prosecutorial privilege exists between the government and the relator.").

Wolff's only argument against the common-interest privilege is that the privileges underlying it do not apply. Because, as discussed, the attorney-client privilege applies to the materials at issue, this argument fails. The Court therefore concludes that the common-interest privilege protects from disclosure those communications made between Salomon's counsel and the Government's counsel which the Government has withheld on the basis of the attorney-client privilege.

### ii. Crime-Fraud Exception

#### 1. Introduction

Having found that the attorney-client privilege protects the documents which Wolff seeks, the Court next must assess Wolff's argument that this protection is pierced by the crime-fraud exception.[8] This would require a prima facie showing that: (i) the Government was engaging or intended to engage in a crime or fraud at the time of the communication in question; and (ii) the communications at issue were in furtherance of the continuing or intended crime or fraud. See In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000) (citing cases). To meet this standard, "'there must be something to give colour to the charge' that the attorney-client communication was used in furtherance of a crime or fraud." In re Grand Jury, 705 F.3d 133, 153 (3d Cir. 2012) (quoting Clark v. United States, 289 U.S. 1, 15 (1933)). The Third Circuit has analogized this

---

[8] It is useful to parse Wolff's present argument: he is here (i) invoking the Government's purported misconduct; (ii) in an effort to establish the crime-fraud exception; (iii) so that he may obtain documents which the Government claims is privileged; (iv) in order to further support his defenses which seek dismissal on the basis of the same alleged misconduct. Thus, the Court does not determine here whether the Affirmative Defenses may insulate Wolff from liability; only whether Wolff is entitled to certain further discovery in his attempt to prove them.

requirement to a "reasonable basis" standard, and has held, on the one hand, that "[t]he burden is not a particularly heavy one," and at the same time, that this is a "reasonably demanding" benchmark under which speculation or evidence that shows a distant likelihood of crime or fraud will not suffice. Id. (quoting In re Grand Jury Investigation, 445 F.3d 266, 275 (3d Cir. 2006); In re Grand Jury Proceedings, 417 F.3d 18, 23 (1st Cir. 2005)). Of note, "[t]he crime-fraud exception is not limited to evidence that supports a finding of common-law fraud," but instead "can encompass communications and attorney work product 'in furtherance of an intentional tort[9] that undermines the adversary system itself.'" Wachtel v. Guardian Life Ins. Co., 239 F.R.D. 376, 380 (D.N.J. 2006) (quoting Madanes v. Madanes, 199 F.R.D. 135, 149 (S.D.N.Y. 2001) and citing In re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 812 (D.C. Cir. 1982)).[10] Misrepresentations by omission may suffice for such a finding. See id.; Kickflip, Inc. v. Facebook, Inc., 2016 U.S. Dist. LEXIS 183588, at *15 (D. Del. Sep. 14, 2016) (citing cases).[11]

The alleged misconduct at the center of Wolff's argument is that although "the Government controlled this case from the outset," through its sealing applications, it "repeatedly

---

[9] Fraud is an intentional tort. See, e.g., Chem. Leaman Tank Lines v. Aetna Cas. & Sur. Co., 89 F.3d 976, 987 (3d Cir. 1996).

[10] Some courts adopt a more expansive view of the privilege, allowing it to encompass "crime, fraud, or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system." In re Sealed Case, 676 F.2d at 812 (emphasis added). But even this construction entails particularly egregious activity. In re Sealed Case itself cited the example of a memorandum describing an improper meeting between an attorney and a judge. Id. at n.74 (citing Moody v. IRS, 210 U.S. App. D.C. 80, 654 F.2d 795, 799-800 (D.C. Cir. 1981)).

[11] This variety of iterations of the crime-fraud exception notwithstanding, Wolff is incorrect in his primary argument that the Government's sealing applications constitute a "fraud on the court." This is because "[n]on-disclosure, or perjury by a party or witness, does not, by itself, amount to fraud on the court." Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003) (quoting In re Levander, 180 F.3d 1114, 1119-20 (9th Cir. 1999)). Instead, "[f]raud upon the court is typically limited to egregious events such as bribery of a judge or juror or improper influence exerted on the court, affecting the integrity of the court and its ability to function impartially." Apotex Corp. v. Merck & Co., 507 F.3d 1357, 1361 (Fed. Cir. 2007). No such conduct is alleged here.

misrepresent[ed] to [the Maryland court] that it had not yet decided whether to take the case." D.E. 243-1 at 7. Wolff primarily argues that the Government's sealing applications omitted critical details about the extent of the Government's control over this matter, a gambit, according to Wolff, geared toward (and resulting in) the Government obtaining an unfair upper hand in the litigation.

As will be discussed, the Court does not believe that Wolff has demonstrated the Government has committed wrongdoing sufficient to warrant the exception's application. However, rather than adjudicate this issue sight-unseen, the Court will order a limited in camera inspection of the materials Wolff seeks so that it may determine whether Wolff's contentions warrant further exploration. This conclusion grows from the notion that a party may be entitled to in camera review upon "a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." See United States v. Zolin, 491 U.S. 554, 572 (1989) (internal citation and quotation marks omitted). If the Court determines, based upon this review, that there is sufficient "colour to the charge that the attorney-client communication was used in furtherance of a crime or fraud," In re Grand Jury, supra, then "[t]he Court then must determine if the [Government] has sustained its burden of proof, specifically if it has given a reasonable explanation of its conduct." Wachtel, 239 F.R.D. at 379 (citing cases). After giving the Government the opportunity to be heard, "the court must decide if the evidence . . . shows that it is more likely than not that the [Government] sought or used legal advice to commit or try to commit a crime or fraud." If the explanation rebuts the prima facie case then the privilege is upheld; if not, the privilege is pierced. Id. (citing cases).

### 2.  The Government's Sealing Applications

The Court has reviewed the Government's sealing applications and related submissions to the Maryland court. Upon this review, the Court concludes that while the Government may have omitted from its applications certain details about the extent of its investigation and prosecution of this matter, none of its omissions or representations could rightly be called criminal or fraudulent (or otherwise sufficiently improper) for purposes of the crime-fraud exception.

The Government's October 2, 2009 sealing application (the "October 2009 application") provides a useful example. In his moving papers, Wolff details the Government's purported control over this case (and over Wolff) and argues that this control was not adequately represented in the October 2009 application. Examples include: the Government communicating at length with LBG counsel and high-ranking employees regarding the allegations in the Qui Tam Complaint (in particular, discussing settlement of the claims against LBG); coordination of prosecutorial efforts among numerous government agencies; the Government taking actions toward Wolff such as directing him to terminate his government-related business activities and demanding that he be fired by LBG; and Government communications with Salomon regarding (and overseeing the filing of) the Amended Complaint, which added Wolff as a defendant. D.E. 243-1 at 10-13; D.E. 261 at 8-14.

In the October 2009 application, the Government advised the Maryland court:

> The Complaint in this case was served on the Attorney General in August of 2006. The Government has been investigating this case diligently since then. In addition to analyzing the materials the relater has supplied, the Government has met with Relater, and has interviewed him about his complex allegations. These meetings have involved investigators and auditors from a number of agencies including the Defense Criminal Investigative Service ("DCIS"), USAID Office of Inspector General ("OIG"), the Defense Contract Audit Agency ("DCAA") and the FBI. These meetings have furthered the Government's understanding of some of the

allegations and have provided additional evidence, as well as further investigative leads.

In addition, the Government has received over 300 hundred of [sic] boxes of documents, along with a significant portion (400 gigabytes) of electronic data stored in LBG's computer systems. Searching both the paper documents and the electronically stored data in a meaningful way has been time intensive and is still ongoing.

The United States Attorney for the District of New Jersey has accepted this matter for criminal prosecution. That office has been in contact with corporate counsel. Recently corporate counsel asked the United States to explore the possibility of engaging in a "global" resolution of criminal, civil and administrative issues between the United States and the defendants. Since that request, the United States and counsel for the corporation have met several times in aid of working through the various issues in aid of a resolution. The United States and corporate counsel are scheduled to continue its discussions and meet on October 8, 2009. The company is aware of the existence of the <u>qui tam</u>. The United States previously applied to this Court and obtained an order partially lifting the seal for purposes of facilitating discussions with corporate counsel.

D.E. 269-7 at 12-13. The Government requested a six-month sealing extension due to the complexity of the allegations and the need for more time to finish its investigation and attempt to resolve the matter. <u>Id.</u> at 14.

What emerges is that, while the October 2009 application did not apprise the Maryland court of every potentially relevant detail of the Government's investigation and prosecution to that date, many of the developments that underlie Wolff's present grievance were fairly summarized there: the Government made clear that it "interviewed [Salomon] about his complex allegations"; that it and LBG counsel "met several times in aid of working through the various issues in aid of a resolution"; and that its meetings with Salomon "involved investigators and auditors from a number of agencies," including DCIS, OIG, DCAA, and the FBI. And while Wolff takes particular issue with the Government's involvement in the settlement process, this also was far from concealed from the Maryland court. As noted, the October 2009 application discussed efforts

17

toward a global settlement; as further examples, in April 2010 the Government advised that it and LBG counsel "have also met several times to work through the myriad civil, criminal and administrative issues connected to achieving resolution of the case," and in October 2010, the Government wrote that "[i]t will attempt to resolve the allegations against . . . Wolff . . . while the complaint and court file remain under seal." D.E. 267-1 at 95, 120.

The applications also raise reasonable grounds for the Government delaying its intervention decision. As a general matter, the Government's investigation required review of a massive amount of information; the Government can hardly be criticized for doing its due diligence before deciding whether to intervene. A more specific example appears in the Government's October 2010 application, which advised that "before making an intervention election the United States would like an opportunity to offer [Wolff and Pepe] an opportunity to address the allegations against them and consider their response." Id. at 122. Similar requests arose from the progression of the criminal case against Wolff, beginning with his indictment in October 2011. See, e.g., D.E. 269-2 at 207-08 (January 2013 application writing that "evidence presented in [Wolff's] criminal trial will be relevant to our assessment of the defendants' potential civil liability, and should substantially aid the government in making an intervention decision concerning [Wolff and Pepe], and streamline any civil action that may follow"); see also id. at 208 (["G]ranting the Government's extension request would avoid the potential for prejudice to the ongoing criminal prosecution since that case concerns allegations similar to those at issue in the qui tam action."); 31 U.S.C. § 3730(c)(4) (court may extend seal "upon a showing by the Government that certain actions of discovery . . . would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts"). As will be discussed below, an investigation does not necessarily amount to formal intervention, and the

18

Government's involvement in the former did not make the latter a foregone conclusion.

This all leads to another important point, which is that the propriety of the Government's requests was a matter squarely for the Maryland court to decide. The FCA provides that "[t]he Government may, for good cause shown, <u>move the court</u> for extensions of the time during which the complaint remains under seal." 31 U.S.C. § 3730(b)(3) (emphasis added). The statute tasks the Government with providing the court with grounds warranting an extension—<u>not</u> with determining that extensions are justified, or for that matter, offering comprehensive case updates. It was for the Maryland court to determine whether to find good cause, to demand more detailed information,[12] or, of course, to deny the sealing applications. Ultimately, Wolff's quarrel is with the FCA's statutory scheme, or possibly with the Maryland court. The Government, though, can hardly be blamed for the fact that the Maryland court granted its requests without inquiry into the minutiae of its investigation.

Of course, this holds true only to the degree that the Government did not act improperly— for example, a blatant lie in the sealing applications would present a different picture altogether. But Wolff has identified nothing to this effect, nor, significantly, has he cited any authority that the Government's actions amount to a crime or a fraud.[13] Cf., e.g., <u>Michael Grecco Prods. v. Alamy Inc.</u>, 2020 U.S. Dist. LEXIS 181961, at *11 (E.D.N.Y. Oct. 1, 2020) (applying crime-fraud exception where party misled the court by knowingly identifying wrong agreement as operative). Simply put, Wolff's arguments amount to little more than his view of how the Government should

---

[12] For example, upon the filing of the Amended Complaint (which of course was known, or knowable, to the Maryland court), the Maryland court could have asked the Government where it obtained the information supporting the updated allegations.

[13] Wolff's counsel confirmed during oral argument that he is not aware of any case where conduct similar to that alleged here yielded application of the crime-fraud exception. The Court likewise knows of no such authority.

have approached the sealing applications.[14] Even if the applications do not amount to a paragon of specificity, Wolff falls well short of demonstrating conduct "that undermines the adversary system itself." Wachtel, supra.

### 3. FCA Practice

This conclusion is supported by a survey of modern FCA practice. By way of introduction, the FCA's legislative history states that

> the Committee feels that with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review and decision. Consequently, "good cause" [for an extension] would not be established merely upon a showing that the Government was overburdened and had not had a chance to address the complaint. . . . The Government should not, in any way, be allowed to unnecessarily delay lifting of the seal from the civil complaint or processing of the qui tam litigation.

S. Rep. No. 99-345, 99th Cong., 2d Sess. 24, reprinted in 1986 U.S. Code Cong. & Admin. News 5266, 5290. On paper, this passage may suggest that the Government has prosecuted this case improperly. However, a holistic and realistic view of FCA practice reveals there is nothing remarkable about the Government's actions. Congress's aspiration for swift intervention decisions by the Government notwithstanding, prolonged sealing periods have become the norm, with courts encountering protracted seals such as the one here commonly treating these as typical incidences of FCA practice. See, e.g., United States v. Baylor Univ. Med. Ctr., 469 F.3d 263, 266 (2d Cir. 2006) (noting sixteen sealing extensions over eight years) (superseded by statute on other grounds, 2009 Amendments to 31 U.S.C. § 3729(c), as recognized in United States ex rel. Hussain v. CDM Smith, Inc., 2017 U.S. Dist. LEXIS 159538, at *29 (S.D.N.Y. Sep. 27, 2017)); United States ex rel. Ven-A-Care of the Fla. Keys., Inc. v. Dey, Inc. (In re Pharm. Indus. Average Wholesale Price

---

[14] Another illustrative example is Wolff's complaint that the Government represented that the case was "recently" assigned to a Government attorney, approximately three months after the assignment. Wolff's differing interpretation of this imprecise adverb does not compel a finding of prosecutorial misconduct.

Litig.), 498 F. Supp. 2d 389, 392 (D. Mass. 2007) (nine-year seal period before government intervened); United States ex rel. Health Outcomes Techs. v. Hallmark Health Sys., 349 F. Supp. 2d 170, 172 (D. Mass. 2004) (eight years); see also Stephen A. Wood, End the Endless Extensions of the Seal Period in False Claims Act Qui Tam Cases, WASHINGTON LEGAL FOUNDATION (Jan. 3, 2019), https://www.wlf.org/2019/01/03/wlf-legal-pulse/end-the-endless-extensions-of-the-seal-period-in-false-claims-act-qui-tam-cases/ ("[M]ulti-year extensions of the seal period are much closer to the norm.").

Even those cases which disfavor such practice tend to note that this is simply a fact of life for courts and defendants confronting the FCA's statutory scheme, and emphasize the importance for courts encountering extension requests to be aware of the prospect of exploitation of the FCA (as opposed to punishing such conduct after-the-fact, as is requested here). See, e.g., United States ex rel. Brasher v. Pentec Health, Inc., 338 F. Supp. 3d 396, 401 (E.D. Pa. 2018) ("[C]ourts considering extension requests should be wary of the ex parte nature of such requests and the ease by which a case can slip into a comfortable routine" of serial requests, resulting in abuses of the statutory scheme) (citing cases) (quotation marks omitted); United States ex rel. Sarmont v. Target Corp., 2003 U.S. Dist. LEXIS 18729, at *20 (N.D. Ill. Oct. 17, 2003) ("Indeed, although 9½ years will take its toll on the freshness of any party's evidentiary arsenal, such is expressly contemplated by the FCA which itself contains a ten year statute of limitations.") (citing 31 U.S.C. § 3731); United States ex rel. Costa v. Baker & Taylor, Inc., 955 F. Supp. 1188, 1190 (N.D. Cal. 1997) (noting "with regret" that earlier extensions may have been influenced by "the effects of inertia and the lack of an opposing party"); cf. Sarmont, 2003 U.S. Dist. LEXIS 18729, at *13 (within context of failure to prosecute qui tam action under FED. R. CIV. P. 41(b), "[l]ength of the investigation alone . . . does not raise a specter of bad faith with respect to the government's

conduct") (citing <u>United States v. Davis</u>, 231 F. Supp. 2d 701, 708 (S.D. Ohio 2002), which wrote

that a ten-year delay in "bring[ing] charges for acts of which [the government] already has

knowledge . . . . is . . . difficult to explain," but "[s]till in all, in the absence of any evidence of bad

faith or other wrongful intent, the Court should no more question the integrity of the U.S.

Attorney's Office for its preparation of a criminal prosecution than it should that of Congress for

its creation of the relevant statute of limitations"). Indeed, even the court in <u>United States ex rel.</u>

<u>Martin v. Life Care Ctrs. of Am., Inc.</u>, 912 F. Supp. 2d 618 (E.D. Tenn. 2012), which excoriated

the government for its years'-long extension requests, calling these "absurd" and indicative of

"significant overreach," did not <u>sua</u> <u>sponte</u> sanction the government,[15] but instead noted that "[i]n

retrospect, . . . the Government's habitual requests for extensions of the election period were

wholly inappropriate," and "concede[d] error" in granting the extensions. <u>See</u> <u>id.</u> at 622-26.

Further supporting the notion that the Government's conduct was not uniquely improper is

the fact that the government enjoys a certain "quasi-party" status even when it does not intervene

in a <u>qui</u> <u>tam</u> case. <u>Cf.</u> <u>N.M. ex rel. Nat'l Educ. Ass'n of N.M.</u>, 2009 U.S. Dist. LEXIS 149054, at

*4 (D.N.M. Nov. 10, 2009). To begin with, the FCA mandates that the government "<u>shall</u>

<u>investigate</u>" violations of the Act. 31 U.S.C. § 3730(a) (emphasis added). Conceptually, the

"United States is the real party in interest in any False Claims Act suit, even where it permits a qui

tam relator to pursue the action on its behalf," <u>United States ex rel. Milam v. University of Texas</u>

<u>M.D. Anderson Cancer Ctr.</u>, 961 F.2d 46, 50 (4th Cir. 1992), and in practice, the FCA contemplates

that "the government might play a role in <u>qui</u> <u>tam</u> cases without formally intervening." <u>United</u>

<u>States ex rel. Capella v. United Techs. Corp.</u>, 1999 U.S. Dist. LEXIS 10520, at *22 (D. Conn. June

3, 1999); <u>see</u> 31 U.S.C. § 3730(c)(3) (where government does not intervene, it still enjoys certain

---

[15] The <u>Martin</u> court considered a motion to continue the case's seal.

statutory rights such as obtaining pleadings and deposition transcripts). Nor is it unheard-of for the government to negotiate settlements without formal intervention. See, e.g., Baylor, 469 F.3d at 266-67 ("Beginning in June 1999, the Government--asserting that it was the real party in interest without formal intervention--filed ex parte motions for severance and transfer of venue . . . . These motions were all granted by the Western District of Washington. At the same time, the Government negotiated settlements with a number of the hospitals, and voluntarily dismissed others."); In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 326 (D. Conn. 2004) ("[T]he Government requested additional extensions of time to complete its evaluation of those defendant-hospitals against which it intended to intervene and to pursue settlement discussions with other defendants, including a 'global' settlement with approximately forty hospitals. These requests were granted by the district court. Altogether, sixteen enlargements of time were granted by the Washington district court."). Indeed, the FCA expressly allows the government to dismiss or settle a case even over the relator's objection and does not require that the government does so only after intervening. See 31 U.S.C. § 3730(c)(2).

Further, the intervention decision itself is not a formality, but a matter of discretion which often follows considerable pre-intervention investigation and attempts at settlement, and which "requires consideration of the costs and benefits of party status." See United States ex rel. Eisenstein v. City of New York, 556 U.S. 928, 933 (2009). As explained in an unofficial Department of Justice memorandum:

> Under the False Claims Act, the Attorney General (or a Department of Justice attorney) must investigate the allegations of violations of the False Claims Act. The investigation usually involves one or more law enforcement agencies . . . . The investigation will often involve specific investigative techniques, including subpoenas for documents or electronic records, witness interviews, compelled oral testimony from one or more individuals or organizations, and consultations with experts. If there is a parallel criminal

investigation, search warrants and other criminal investigation tools may be used to obtain evidence as well. . . .

Intervention by the Department of Justice in a qui tam case is not undertaken lightly. Intervention usually requires approval by the Department in Washington. As part of the decision process, the views of the investigative agency are solicited and considered, and a detailed memorandum discussing the relevant facts and law is prepared. This memorandum usually includes a discussion of efforts to advise the named defendant of the nature of the potential claims against it, any response provided by the defendant, and settlement efforts undertaken prior to intervention.[16]

*FALSE CLAIMS ACT CASES: GOVERNMENT INTERVENTION IN QUI TAM (WHISTLEBLOWER) SUITS*,

https://www.justice.gov/sites/default/files/usaoedpa/legacy/2012/06/13/InternetWhistleblower%2 0update.pdf.

All told, the conduct that Wolff complains of appears to fall within that fairly contemplated by the FCA and embraced by modern FCA practice and thus, on its own, does not yield a finding of being conducted in order to perpetrate or further a crime or fraud. As a result, Wolff will need to show something more to warrant application of the crime-fraud exception. However, in view of Judge Linares's express ruling that Wolff is entitled to discovery on the Affirmative Defenses, coupled with the minimal showing required to warrant <u>in camera</u> review, <u>Zolin</u>, <u>supra</u>, the Court will exercise its discretion to order the Government to provide a limited sampling of documents listed in its privilege log for <u>in camera</u> review so that the Court may determine if they contain information that gives sufficient "colour to the charge" that the Government acted improperly in keeping this case sealed while actively prosecuting the charges against Wolff. If so, the Court will order additional briefing to allow the Government the opportunity to offer a reasonable explanation

---

[16] Of note, the DOJ memo adds that "[t]his memorandum is considered to be attorney work product exempt from disclosure."

for its conduct, and will then determine whether the attorney-client privilege has been pierced. <u>See</u> <u>In re Grand Jury</u>; <u>Wachtel</u>, <u>supra</u>.

### iii. Attorney Work Product

In addition to asserting the attorney-client privilege, the Government has withheld the communications at issue as attorney work product. Although the Court has concluded that these materials are protected under the former privilege—and despite the Government's privilege log asserting both privileges in connection with all the items listed therein—the Court nonetheless addresses the Government's claim of work product. This is because the parties have advised the Court that the current version of the privilege log corresponds to only a fraction of the Government's documents. <u>See, e.g.</u>, D.E. 253 at 26. Because "the work-product doctrine . . . must be considered independently from the attorney-client privilege, since work product is distinct from, and broader than, the attorney-client privilege," <u>Leonen v. Johns-Manville</u>, 135 F.R.D. 94, 96 (D.N.J. 1990) (citing cases), the Court finds it prudent to render an independent determination on the work product question (which is <u>sub</u> <u>judice</u>). Among other things, this will avoid the need for another round of briefing should the Government's full log later reveal materials to which the (broader) work-product doctrine applies, but the attorney-client privilege does not.

The work product doctrine, established in the seminal case <u>Hickman v. Taylor</u>, 329 U.S. 495 (1947), protects from disclosure materials prepared by an attorney or their agent in anticipation of litigation or for use in trial. Its purpose "is to encourage careful and thorough preparation for litigation by a party's attorney." <u>United States v. Ernstoff</u>, 183 F.R.D. 148, 153 (D.N.J. 1998) (citing cases). "Unlike the attorney-client privilege, . . . which is absolute, the work-product privilege is qualified. The qualified privilege depends on the information being sought and the adversary's need for the information." <u>George v. Siemens Indus. Automation, Inc.</u>, 182 F.R.D.

134, 140 (D.N.J. 1998) (citations omitted) (citing <u>Hickman</u>, 329 U.S. at 512 and <u>United States v. Nobles</u>, 422 U.S. 225, 239 (1975)). As above, the party seeking to invoke the doctrine has the burden of proving it applies. <u>Conoco, Inc. v. U.S. Dep't of Justice</u>, 687 F.2d 724, 730 (3d Cir. 1982).

The doctrine has been codified in FED. R. CIV. P. 26(b), which states in relevant part that

> [o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . . But, . . . those materials may be discovered if . . . the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

FED. R. CIV. P. 26(b)(3)(A). The rule continues with an important qualification: "[i]f the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." FED. R. CIV. P. 26(b)(3)(B).

The Third Circuit has explained Rule 26(b)(3)'s binary as follows:

> Rule 26(b)(3) establishes two tiers of protection: first, work prepared in anticipation of litigation by an attorney or his agent is discoverable only upon a showing of need and hardship; second, "core" or "opinion" work product that encompasses the "mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation" is "generally afforded near absolute protection from discovery." Thus, core or opinion work product receives greater protection than ordinary work product and is discoverable only upon a showing of rare and exceptional circumstances.

<u>In re Cendant Corp. Sec. Litig.</u>, 343 F.3d 658, 663 (3d Cir. 2003) (quoting FED. R. CIV. P. 26(b)(3) and <u>In re Ford Motor Co.</u>, 110 F.3d 954, 962 n.7 (3d Cir. 1997)). While "opinion work product protection is not absolute, [it] requires a heightened showing of extraordinary circumstances." <u>Id.</u> at 664 (collecting cases).

In his motion, Wolff presents the fact work product framework—i.e., that he has a substantial need for the materials at issue, and that he cannot otherwise obtain them without undue hardship. In opposition, the Government argues that the materials Wolff seeks constitute opinion work product, and therefore advocates for application of the "exceptional circumstances" standard, which the Government argues Wolff cannot meet.

The Court agrees with the Government that the materials at issue constitute opinion work product, but disagrees with the notion that Wolff cannot make the "heightened showing of exceptional circumstances" that this finding entails. To wit: "[t]he production of opinion work product . . . is appropriate . . . when the activities of counsel are directly at issue." United States v. Exxon Corp., 87 F.R.D. 624, 639 (D.D.C. 1980); see also Galgano v. Cty. of Putnam, 2018 U.S. Dist. LEXIS 240526, at *3 (S.D.N.Y. June 29, 2018) ("[I]n a case involving allegations of prosecutorial misconduct related to a closed criminal investigation, the prosecutor's files are discoverable to the extent that the documents 'go to the heart' of the litigation, even where the file reveals 'core' or 'opinion' work product containing the prosecutor's mental impressions, conclusions, opinions, or legal theories.") (collecting cases); MAG Mut. Ins. Co. v. Brown, 2015 U.S. Dist. LEXIS 193132, at *44 (D.S.C. July 24, 2015) ("Courts have held that when the activities of counsel are directly at issue in a case, documents relevant to those activities are discoverable, even though they are work product.") (ordering production of opinion work product); Charlotte Motor Speedway, Inc. v. Int'l Ins. Co., 125 F.R.D. 127, 131 (M.D.N.C. 1989) (ordering submission for in camera review settlement documents that were claimed as opinion work product because whether insurance company reached settlement agreement in good faith was directly in issue); Moore's Federal Practice, ¶ 26.64[4] ("[W]hen the activities of counsel are inquired into because

they are at issue in the action before the court, there is cause for production of documents that deal with such activities, though they are 'work product.'").

Although the universe of situations where opinion work product is discoverable is narrow, this case falls squarely within it, as here "the activities of counsel are directly at issue." See Exxon, 87 F.R.D. at 639. Wolff's Affirmative Defenses speak head-on to the alleged conduct of the Government prosecutors. As a result, this is the unique situation where opinion work product is discoverable.

Notwithstanding, the Court also is mindful of the sensitive nature of the documents Wolff seeks. As above, therefore, it finds that the proper treatment for materials withheld on the basis of the work product doctrine (but not on the basis of attorney-client privilege) to be in camera inspection by the Court. Therefore, the parties will be directed to advise the Court in the event any such documents are identified by the Government, whereupon the Court will issue an appropriate Order for in camera inspection of such materials.

### IV.  The Government's Motion

#### a.  Legal Standard and Scope of Motion

The Government has filed a motion seeking an order compelling Wolff to produce a privilege log. The Government argues that it is entitled to a log detailing communications among and between Wolff and his attorneys (i) from the date Wolff retained counsel in connection with this matter (which is believed to be July 1, 2009) through September 23, 2010 (which is approximately one month after Wolff's departure from LBG); and (ii) which relate to any of Wolff's Affirmative Defenses.[17] According to the Government, a description of these documents

---

[17] Wolff has an independent obligation under the discovery rules to produce a log of any privileged materials relating to any of his affirmative defenses. However, because the Government's motion addresses only the three defenses referenced above, the Court's discussion will be so limited.

might undermine Wolff's Affirmative Defenses; for example, by revealing that during the negotiation process, through which Wolff claims the Government extorted him, Wolff was adequately represented by counsel and may have in fact welcomed the continued seal on the Qui Tam Complaint. The Government also posits that this log may reveal that Wolff waived the attorney-client privilege.

The Government's motion proceeds under FED. R. CIV. P. 26(b)(5)(A), which states that

> [w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> (i)     expressly make the claim; and
>
> (ii)    describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

The Government also cites Local Civil Rule 34.1, which provides that

> [w]here a claim of privilege is asserted in responding or objecting to any discovery requested in requests for documents, and information is not provided on the basis of such assertion, the party asserting the privilege shall in the response or objection identify the nature of the privilege (including work product) which is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, set forth the state privilege rule being invoked. When any privilege is claimed, the party asserting it shall indicate, as to the information requested, whether any such documents exist.

In opposition, Wolff argues that the materials in question are not discoverable in the first instance, thereby rendering inapplicable any privilege log requirement. He also contends that the requested log is not proportional to the needs of the case, citing FED. R. CIV. P. 26(b)(1). For the reasons described below, the Court will order Wolff to provide a privilege log for materials relating to his Affirmative Defenses.

### b. Analysis

At the core of this dispute is the basis for Wolff's objections to the Government's request for a privilege log. The Government focuses on Wolff's privilege objections, which the Government correctly asserts are improper. Indeed, "[t]he purpose of a privilege log is to identify for the opposing side those documents that exist in response to a document request but are not being produced because of a privilege assertion." Wachtel v. Health Net, Inc., 239 F.R.D. 81, 106 (D.N.J. 2006). The log then enables "the court and counsel to determine whether there should be a further inquiry into the bases for the assertion." Id. It therefore is illogical for Wolff to resist production of a privilege log on the grounds that the materials at issue are privileged.

Wolff focuses on his objections grounded in the notion that the documents that the Government wants logged are not discoverable in the first instance. Unlike the above, this is a proper basis to object to a privilege log request. As the Advisory Committee Notes make clear, "[t]he obligation to provide pertinent information concerning withheld privileged materials applies only to items 'otherwise discoverable.'" See FED. R. CIV. P. 26(b)(5), 1993 Adv. Comm. Note (quoting FED. R. CIV. P. 26(b)(5)(A)). Thus, Wolff is not required to prepare a privilege log for materials that do not, as a threshold matter, fall within the ambit of Rule 26(b)(1).

A review of Wolff's discovery responses and related correspondence reveals that he lodged various objections to the Government's privilege log request. His formal response to the Government's document request asserts a general objection "to the extent that [the requests] seek information that is irrelevant to the claims as set forth in the First Amended Complaint and are not reasonably calculated to lead to the discovery of admissible evidence." D.E. 244-4 at 4. His specific objection to the request for documents pertaining to his affirmative defenses does not raise either relevance or privilege, but states, inter alia, that the request is overbroad and unduly

burdensome. Id. at 5. Wolff objected on privilege grounds to the request for materials relied upon in drafting his Answer. Id. at 5-6. Wolff's correspondence with the Government concerning this dispute references both privilege and general discoverability objections. See D.E. 244-27; 244-9.

It is true that Wolff did not raise a specific formal relevance objection in response to the Government's request for documents concerning his affirmative defenses. However, while general objections often are disfavored, the Third Circuit has noted—even after the 2015 Amendments to Rule 34 which call for specificity in objecting to document demands—that "[t]he Federal Rules do not prohibit general objections." See In re Biomet Orthopaedics Switz. GmbH, 742 F. App'x 690, 699 (3d Cir. 2018) (quoting Grider v. Keystone Health Plan Cent., Inc., 580 F.3d 119, 139 (3d Cir. 2009)). Rather, "[t]he legitimacy of a general objection turns on the objection and its context." Grider, 580 F.3d at 139. Moreover, notwithstanding that "[t]he failure to object to a discovery request in a timely fashion may constitute a waiver of the objection[,] it is within the Court's discretion not to compel discovery which is patently improper." Iqvia, Inc. v. Veeva Sys., 2018 U.S. Dist. LEXIS 176091, at *4 (D.N.J. Oct. 11, 2018) (quoting Boselli v. Se. Pennsylvania Tramp. Auth., 108 F.R.D. 723, 726 (E.D. Pa. 1985)).

In view of the above, the Court concludes that Wolff did not waive his relevance objection, which was raised in Wolff's general objections to the Government's document demands and throughout his subsequent communications with the Government. The Court further concludes that the Government's request for a privilege log pertaining to all communications between and among Wolff and his counsel over a fifteen-month period is "patently improper." This conclusion is equally grounded in relevance, overbreadth, and burdensomeness considerations. See, e.g., Symetra Life Ins. Co. v. Rapid Settlements, Ltd., 2008 U.S. Dist. LEXIS 16799, at *16-17 (E.D.

Pa. Feb. 29, 2008) ("all communications" request found to be "overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence") (citations omitted).

However, to the extent the Government seeks a privilege log for materials that bear upon Wolff's Affirmative Defenses, this request is proper. It is the law of the case, common sense, and a product of Rule 26(b)(1) that the Government is entitled to a log of materials that may undercut Wolff's defenses grounded in allegations of the Government's misconduct so that the Government may then "determine whether there should be a further inquiry into the bases for the assertion" of privilege over these materials. Wachtel, 239 F.R.D. at 106. Just as Judge Linares's decision requires that Wolff is entitled to discovery on these matters, Rule 26(b)(1), by way of Rule 26(b)(5), entails that the Government may obtain a log of privileged materials that are "relevant to [Wolff's] defense[s]." FED. R. CIV. P. 26(b)(1).[18]

Finally, Rule 26 requires that discovery must be "proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). This evaluation considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. This matter concerns allegations of widespread fraud against the government, a substantial amount in controversy, and

---

[18] As noted, the Government also states that a privilege log may reveal that, by way of the Affirmative Defenses, Wolff waived the attorney-client privilege. "The attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that . . . the advice was . . . relevant to the legal significance of the client's conduct." Livingstone v. N. Belle Vernon Borough, 91 F.3d 515, 537 (3d Cir. 1996) (citing Restatement of the Law Governing Lawyers § 130(1) (1996) and Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994)). However, Wolff's defenses center on the alleged actions of the Government, not Wolff's counsel. It therefore is a bridge too far to say that Wolff has waived the privilege because the advice rendered to Wolff by his attorneys is "relevant to the legal significance of [Wolff's] conduct," since, in the first instance, it is the Government's conduct—not Wolff's or his attorneys'—at issue in the Affirmative Defenses. Cf. Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975) (holding defendants waived privilege by raising qualified immunity defense because "the legal advice they received is germane to the qualified immunity defense they raised") (emphasis added). The Government's waiver argument therefore is denied.

parties with significant assets, and the instant issue involves information in Wolff's singular possession which could significantly impact the veracity of Wolff's defenses. While a log of all communications may be disproportionate, a log consisting strictly of communications concerning the Affirmative Defenses is not.

### V.    Conclusion

In view of the above, the Court will issue an Order on Wolff's motion directing the Government to provide for in camera inspection a sampling of materials delineated in the Government's privilege log. The Court will review these items and issue a determination as to whether further briefing is warranted. The Court also will order the parties to advise the Court in the event a subsequent version of the Government claims privilege over any documents on work product grounds, but not on attorney-client privilege grounds, whereupon the Court will issue an Order for in camera inspection of such materials. The Court will issue an Order on the Government's motion directing Wolff to prepare a privilege log of all communications between Wolff and his counsel or among Wolff's counsel which are relevant to Wolff's fifth, sixth, or seventh affirmative defenses.

Dated: December 10, 2020

*/s/ Cathy L. Waldor*
Cathy L. Waldor, U.S.M.J.

33